## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Anthony D. Davis,

Plaintiff,

v.

Louis DeJoy, U.S. Postmaster General,

Defendant.

Case No. 20-cv-7456

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Davis claims that his former employer, Defendant Louis DeJoy, United States Postmaster General, violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by terminating him due to his race, color, and sex. Defendant has moved for summary judgment on all Plaintiff's claims. [41]. For the reasons explained below, this Court grants Defendant's motion.

### I. Local Rule 56.1

"Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted). "We have frequently said that it is within the district court's

1

discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014).

Defendant argues that Plaintiff failed to comply with Rule 56.1 [53] at 2–3. The Court agrees that Plaintiff did not fully comply and considers some of Defendant's facts undisputed because of this. Many of Plaintiff's responses to Defendant's statements improperly add argument, noncontradictory facts, and/or fail to provide a record citation. [48] ¶¶ 10, 12, 16, 18, 19, 20, 21, 24–30, 32–39, 41–44, 47–48, 51, 55, 69–71, 74–75, 78–80. Additionally, Plaintiff improperly responds "unknown" to properly supported facts. [48] ¶¶ 56–57, 62.

In addition, many of Plaintiff's responses and statements rely on improper evidence. [53] at 3–5. Under Rule 56(c), an affidavit or declaration used to oppose a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Rule 602 similarly states that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Accordingly, in an affidavit opposing summary judgment, "[c]onclusory allegations, unsupported by specific facts, will not suffice." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003) (citation omitted). Many of Plaintiff's responses and statements mirror Plaintiff's affidavits that contain allegations and

2

speculation not based on personal knowledge or other evidence. Thus, the Court disregards those facts.

## II. Background[1]

### A.     Plaintiff's Employment

Plaintiff Anthony Davis is an African American man, who was hired as a postal inspector at the Chicago division headquarters of the United States Postal Inspection Service (USPIS) in January 2013. [43] ¶¶ 1–2. As a postal inspector, Plaintiff conducted investigations and was expected to serve as a witness in court and administrative proceedings. *Id.* ¶ 3. Therefore, Plaintiff understood that his honesty and credibility were important attributes to develop and maintain for his job. *Id.* ¶ 4.

Plaintiff was first assigned to a team called the mail theft team, which was comprised of about six inspectors and was supervised by a team leader. *Id.* ¶¶ 5–6. Beginning in June 2014, Juan Vargas, a Hispanic male, led the mail theft team. *Id.* ¶ 6. Vargas was supervised by an assistant inspector in charge (AIC), who at all times relevant was Victor Demtschenko, a white male. *Id.* ¶ 7. Demtschenko was Plaintiff's second-level supervisor. *Id.* An inspector in charge (INC) leads the USPIS's Chicago division and directly supervises the assistant inspectors in charge. *Id.* ¶ 8. Beginning in 2013, the INC was Antonio Gomez, a Hispanic male. *Id.*; Def. Ex. 11. Plaintiff was

---

[1] This Court takes these facts from Defendant's Statement of Facts [43], Plaintiff's Response to Defendant's Statement of Facts [48], Plaintiff's Statement of Additional Facts [48], Defendant's Response to Plaintiff's Statement of Additional Facts [54], and various exhibits and declarations the parties have submitted in connection with Defendant's motion for summary judgment.

later assigned to the homeland security team, where his team leader was Phillip Dunne, a Black man. [43] ¶¶ 5, 9.

Inspectors were expected to log 50 hours of work each week. *Id.* ¶ 10. They recorded their daily work and leave hours, as well as a summary of the work performed and cases involved, in a database called ISIIS, which was also referred to as an eDiary. *Id.* Submitting eDiary entries for supervisory approval was accompanied by an electronic certification of their accuracy. *Id.* ¶ 11. To perform their work, inspectors were issued vehicles, which, according to agency policy, were "for official purposes only" and "use . . . for personal convenience [was] strictly prohibited." *Id.* ¶ 12; Def. Ex. 9. USPIS policy further dictated that "[n]o employee shall obtain, use or disclose official, non-public information for other than authorized reasons" and that any "[d]eliberate falsification or misrepresentation in official communications, either written or oral, is prohibited." *Id.* ¶ 13.

## B. First Office of Inspector General (OIG) Investigation

The National Crime Information Center (NCIC) is a criminal records database that was available to postal inspectors. *Id.* ¶ 14. In August 2014, Plaintiff applied for access to an additional database, the Consolidated Lead and Evaluation Reporting (CLEAR) database, which provides greater geographic reach than NCIC. *Id.* ¶ 15. Access to CLEAR required an application and vetting process, which involved a criminal background check. *Id.* ¶ 16; Def. Ex. 11. During the vetting, an arrest in Plaintiff's history had come to the agency's attention. [43] ¶ 16. Vargas met with Plaintiff in the cafeteria to ask him about it. *Id.* Plaintiff found the way Vargas

4

conducted this conversation discriminatory because he believed Vargas would not have held such a conversation in the cafeteria with non-Black inspectors but would have instead had them in his office. *Id.* ¶ 18.

Next, Plaintiff met with Vargas, Demtschenko, assistant-inspector-in-charge Bill Hedrick, and Gomez in Gomez's office. *Id.* ¶ 19. Because it was agency policy to refer issues related to inspector arrests to the OIG, a separate law enforcement agency within the Postal Service with oversight over misconduct investigations, Gomez told Plaintiff that he had referred the matter to the OIG. *Id.* ¶¶ 19–20. Gomez also told Plaintiff that he was transferring Plaintiff to the homeland security team during the investigation to protect Plaintiff and the agency. *Id.* ¶ 21.

OIG Special Agent David Enos, a white man, interviewed Plaintiff as part of the investigation. *Id.* ¶ 23. Agent Enos questioned Plaintiff about his arrest and, as relevant, about a 1999 civil legal action against Plaintiff involving unpaid rent. *Id.* ¶ 24. Regarding the outstanding rent, Agent Enos commented that Plaintiff "may want to take care of this debt so it can be off your record as a postal inspector." *Id.* The OIG issued findings in this investigation, and Plaintiff was not disciplined as a result. *Id.* ¶ 25. Plaintiff alleges that this investigation and the resulting transfer to homeland security was evidence of race discrimination as it was "excessive" and unfair because it meant that he had to transfer all his mail theft cases to a white colleague. *Id.* ¶ 26.

## C. Plaintiff's Efforts to Resolve the Unpaid Rent Matter

After his interview with Agent Enos, Plaintiff took action to pay the unpaid rent from the 1999 civil lawsuit from his college days at Illinois State University in

Bloomington, Illinois. *Id.* ¶ 27. Specifically, Plaintiff noticed a hearing for January 9, 2015, in the Eleventh Judicial Circuit in McLean County, Illinois to satisfy and dismiss the matter. *Id.* ¶ 28. On January 9, 2015, while on duty Plaintiff drove his agency-issued vehicle to Bloomington. *Id.* ¶ 29. Plaintiff attended his court hearing and then performed five or six hours of postal inspection work in Bloomington. *Id.*; Def. Ex. 16. Plaintiff reported in an eDiary entry that he worked 9.5 hours for that day, did not "back out" any time for personal business or take any leave, and "[p]erformed vehicle and safety checks in the Bloomington/Normal zip area." [43] ¶ 30.

At the court hearing, Plaintiff learned that he needed to pay the owner of the apartment before he could have the case dismissed. *Id.* ¶ 31. To locate the owner, Plaintiff searched a county database for deeds, and on January 12, 2015, he used a criminal records database at work (NCIC or CLEAR) to further investigate the property owner. *Id.* ¶ 32. Plaintiff admitted that these searches were considered personal business. *Id.* ¶ 33. After locating the owner, Plaintiff arranged to meet him in DeKalb, Illinois on January 28, 2015 to settle the debt. *Id.* ¶ 34. Plaintiff admitted that this meeting was also personal business. *Id.* Plaintiff drove his government vehicle from Chicago to DeKalb and met with the property owner, paid the settlement, and received the documents he needed to dismiss the case. *Id.* ¶ 35. Plaintiff performed postal work nearby. *Id.* ¶ 34. Plaintiff reported in an eDiary entry that he worked 9 hours that day doing "[s]eeding and carrier and vehicle checks in Dixon[,] IL," and did not back out any time for personal activities or take any leave.

*Id.* ¶ 36. However, Plaintiff's toll records reflected that he only spent about three total hours in Dixon that day. *Id.* ¶ 37.

On January 30, 2015, Plaintiff drove his government car to Bloomington, went to court, and resolved the matter against him, all while on duty. *Id.* ¶ 38. Like his previous rent-related activities, Plaintiff acknowledged that this was personal business. *Id.* Plaintiff reported in an eDiary entry that he worked 10 hours that day, which included one hour of physical fitness time. *Id.* ¶ 39. Plaintiff further reported that he performed "[v]ehicle and carrier security checks in Bloomington[,] IL," and he did not take any leave. *Id.*

### D. OIG's Second Investigation

A second OIG investigation was opened into Plaintiff's conduct to determine whether he submitted false eDiary information on January 9, 28, and 30. *Id.* ¶ 40. Plaintiff was interviewed by Agent Enos and other OIG agents, and he acknowledged that he had arranged his work schedule around his legal activities and that those activities were personal business. *Id.* ¶ 41. The second OIG investigation found that: (1) Plaintiff used his government vehicle to go to court and meet the property owner while on duty; (2) he submitted eDiary entries for January 9, 28, and 30 without backing out time for his personal errands or taking leave; and (3) he ran 36 CLEAR database queries to locate the property owner, and he initially denied doing so in the OIG interview before admitting to doing so and acknowledging that he had not been authorized to do so. *Id.* ¶ 42.

7

### E.    Plaintiff's Removal

As a result of the second OIG investigation, Vargas presented Plaintiff with a notice of removal on October 16, 2015. *Id.* ¶ 43. The proposed removal was supported by three charges based on the OIG's findings: (1) misuse of an official government vehicle on three dates in January 2015 when Plaintiff used his vehicle for personal convenience; (2) misuse of official information on January 12 when Plaintiff used the CLEAR database for personal reasons; and (3) providing false and/or misleading information in connection with an official matter when Plaintiff submitted eDiary reports that misstated his working hours on January 9, 28, and 30, when he initially denied using the CLEAR database for personal reasons in his second OIG interview, and when he stated that he had a permissible reason to use the CLEAR database. *Id.* Vargas explained to Plaintiff that his actions had violated agency policy and had damaged his credibility, particularly because he made false or misleading statements. *Id.* ¶ 44. Vargas emphasized that Plaintiff's conduct was problematic because criminal procedural rules would likely require the information about Plaintiff's misconduct to be disclosed to any criminal defendants that Plaintiff would provide testimony against, meaning that Plaintiff's credibility as a witness was impaired. *Id.* Vargas concluded that Plaintiff's integrity, honesty, and trustworthiness had been irreparably compromised, and Plaintiff could no longer perform the duties of a postal inspector. *Id.*

Plaintiff was offered the opportunity to resign in lieu of termination, but he rejected that offer. *Id.* ¶ 45.  Instead, Plaintiff, through counsel, submitted a written

response to the proposed removal, and he provided an oral response to AIC Demtschenko. *Id.* ¶ 46. Plaintiff argued, among other things, that his actions in driving to Bloomington and DeKalb and using agency resources to locate the property owner should be considered work-related, because Agent Enos had ordered him to take care of the 1999 lawsuit. *Id.* After considering the record, Demtschenko determined that the charges in the proposed removal were sustained, and that the penalty of removal was appropriate. *Id.* ¶ 47. INC Gomez agreed with this action. *Id.*

Demtschenko issued the removal letter to Plaintiff on February 12, 2016. *Id.* Plaintiff appealed the removal decision to Deputy Chief Inspector Gary Barksdale. *Id.* ¶ 52. After a hearing on the appeal, a hearing officer issued a proposed decision independently finding that the charges against Plaintiff were supported by a preponderance of the evidence and that Plaintiff's conduct disqualified him from continued service as a postal inspector. *Id.* Deputy Chief Barksdale accepted the hearing officer's decision. *Id.*

### E. Plaintiff's EEO Complaint and This Litigation

Plaintiff filed a formal complaint with Postal Service's Equal Employment Opportunity office on April 11, 2016. *Id.* ¶ 64. Plaintiff asserted race and gender discrimination. *Id.* The EEO accepted the following claim for investigation: whether Plaintiff was discriminated against based on his "Race (Black) and Sex (Male) when [o]n October 16, 2015, [he was] issued a Notice of Proposed Removal, which was subsequently upheld via a Letter of Decision dated February 12, 2016." *Id.* ¶ 65. After his administrative action concluded, Plaintiff filed this lawsuit and brought claims

against Defendant under Title VII and Section 1981 for color, race, and sex discrimination. *Id.* ¶ 66; [10]. Plaintiff claims the following actions were discriminatory:

(1) Plaintiff was the only Black male inspector on the Mail Theft team, and his supervisors were white and Hispanic.

(2) Plaintiff was asked questions by his immediate supervisor while separated from his white inspector teammates.

(3) Plaintiff was subject to a second "background and credit check" to evaluate the same information that had been evaluated just one and a half years after Plaintiff joined the agency.

(4) The agency investigated an issue relating to an arrest that was not "a violation of the employment application" and said he withheld information.

(5) He was removed from duty before any factual charges were filed.

(6) His supervisor called him an airhead "several times."

(7) Another supervisor "falsely accused" him and issued him a reprimand for laying his weapon on the table in the presence of a suspect.

(8) A supervisor "falsely accused" him of losing agency property when someone else was responsible for that property.

(9) A supervisor directed him to be involved in an undercover operation with Black suspects because of Plaintiff's race.

(10) His immediate supervisor refused to allow him to participate in "advancement trainings."

(11) The agency made false allegations and statements.

(12) His immediate supervisor refused to allow him to participate in a big arrest operation.

> (13)   Agency supervisors did not comply with agency procedure when responding to a situation where a white inspector had been arrested.

[43] ¶ 68; [10] ¶ 13.

By way of background in late 2013, a piece of electronic surveillance equipment that Plaintiff had used went missing, and he was issued a letter of warning by then-acting team leader Jack Donnelly. [43] ¶ 69. Plaintiff testified that this was racially discriminatory because he was the only inspector questioned and disciplined regarding the missing equipment, although he had acknowledged at the time that "he should have maintained control of the device." *Id.* Plaintiff also claims that an acting team leader—not Vargas, Demtschenko, or Gomez—improperly sent him to interview an individual who recognized Plaintiff from his involvement in a related undercover operation. *Id.* ¶ 70. Plaintiff said this was evidence of discrimination because the team leader only chose him for the interview because of his race. *Id.*

In early 2014, Demtschenko issued Plaintiff a verbal warning for leaving his weapon unsecured in the presence of visitors, which Plaintiff contends was false. *Id.* ¶ 71. Demtschenko testified that the purpose of the discussion, which was not official discipline, was to remind Plaintiff of firearm safety, but Plaintiff testified that this was racially discriminatory because he was performing better than his white teammates at the time. *Id.*

Regarding Vargas's behavior, mail theft team members were "on call" on certain weekends on a rotating basis to respond to any weekend incidents. *Id.* ¶ 72. Plaintiff described a situation in mid-2014 where he did not answer a weekend call

from Vargas while he was on duty. *Id.* The following workday, Vargas called Plaintiff into his office and called him an "airhead" and told him not to make "airhead decisions." *Id.* Plaintiff claims that Vargas used the term "airhead" towards him one other time about a month later after Plaintiff had missed something on a case. *Id.* Plaintiff claims that the term "airhead" is a derogatory term used to refer to Black males because he heard it used that way when he worked for the Chicago Police Department. *Id.* ¶ 73. Gomez, Demtschenko, and Vargas, who all have decades of law enforcement experience, testified that they did not understand the term "airhead" to have racial implications. *Id.* ¶ 74. Plaintiff did not know why Vargas called him an airhead, but he "felt discriminated against by [Vargas] calling [him] that and demeaning [him], using derogatory language towards [him]." *Id.* ¶ 75.

The members of the mail theft team were allowed to attend non-mandatory monthly events with an outside organization called the International Association of Financial Crimes Investigators (IAFCI), which included trainings and networking activities. *Id.* ¶ 76. In late 2014, Vargas told Plaintiff he could not attend an IAFCI meeting because there was another future training he wanted Plaintiff to attend instead. *Id.* ¶ 77. Plaintiff testified that this action was discriminatory because Vargas allowed his white teammates to attend the IAFCI event and Plaintiff was not aware of any alternate trainings. *Id.* Plaintiff did not know whether Vargas restricted his white teammates' abilities to attend IAFCI events at any other time. *Id.*

Finally, for an arrest operation that occurred on October 28, 2014, Plaintiff testified that Vargas did not allow him to go into the field even though Plaintiff had

helped plan the operation. *Id.* ¶ 78. Instead, Plaintiff supported the operation from the command center in the office. *Id.* Plaintiff thought this action was race discrimination because he was the only Black team member at the time, and he was the only inspector who was not in the field. *Id.* Vargas testified that his decision was made because Plaintiff had good analytical skills and had been referred to the OIG at that point, so Vargas wanted to keep Plaintiff in a position where he would not need to provide testimony in any future prosecution. *Id.* ¶ 79.

## III.  **Legal Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling

13

on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## III. Analysis

Defendant moves for summary judgment on Plaintiff's claims, arguing that Defendant did not discriminate against Plaintiff because of his race, color, or gender under any method of proof and his claims fail as a matter of law. [42].

As an initial matter, Defendant argues that Plaintiff failed to respond to its argument that he does not have viable color or gender discrimination claims. [42] at 13 n.2, 16; [53] at 15. The Court agrees. *See* [49]. Therefore, Plaintiff has abandoned his color and gender discrimination claims. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (where plaintiff failed to defend her claim against defendant's arguments on summary judgment, she abandoned that claim); *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016) (plaintiff's failure to respond to defendant's argument that it was entitled to summary judgment on claim meant that plaintiff conceded that summary judgment on that claim was warranted).

Even if Plaintiff did not abandon his color and gender discrimination claims, summary judgment would be appropriate. Plaintiff did not bring a claim for color discrimination at the administration level and concedes that this claim is not distinct from his claim of race discrimination. [42] ¶¶ 64, 67. Therefore, the color

14

discrimination claim has not been properly exhausted nor is there any evidence supporting this claim. *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005) (a "Title VII plaintiff may bring only those claims that were included in [his] EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations") (internal citation and quotation omitted). As to the gender discrimination claim, Plaintiff concedes he has not presented any evidence of similarly situated female inspectors that were treated more favorably than he was. [42] ¶ 63. Thus, the Court grants summary judgment on the color and gender discrimination claims, and the Court turns to the remaining race discrimination claim.

## A.      Race Discrimination Claim

The Court's singular question boils down to whether the plaintiff's race caused his termination. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (providing the legal framework under Title VII); *see Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015) (noting the "legal analysis for discrimination claims under Title VII and § 1981 is identical"). Plaintiff can proceed to prove his Title VII and § 1981 claim under two methods.

First, Plaintiff may use the framework developed by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case by showing that: "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of

his protected class received better treatment from his employer." *Igasaki*, 988 F.3d at 957; *see also Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). If the plaintiff establishes a prima facie case, the burden then "shifts to the employer to offer a nondiscriminatory motive"; if the employer does this, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir. 2020), *reh'g denied* (July 31, 2020)).

In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit introduced an alternative to the *McDonnell Douglas* framework. Under *Ortiz*, the core question in any employment discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action" at issue. 834 F.3d 760, 765 (7th Cir. 2016). When using this approach, courts ask only "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). The Seventh Circuit's decision in *Ortiz*, however, "did not alter '*McDonnell Douglas* or any other burden-shifting framework.'" *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 766).

The Court will evaluate Plaintiff's race discrimination claim under the *McDonnell Douglas* and *Ortiz* frameworks. No matter the approach, Plaintiff fails to raise a triable of fact as to whether Defendant's termination was discriminatory.

16

### 1. *McDonnell Douglas* Framework

As to the *McDonnell Douglas* approach, Defendant argues that Plaintiff cannot identify similarly situated employees treated more favorably and Defendant articulated legitimate, non-discriminatory reasons for the termination and Plaintiff cannot establish pretext. [42] at 16–22. The Court agrees.

First, while similarly situated parties need not be identical in every conceivable way, they must be directly comparable to the plaintiff in "all material respects." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Factors considered here "most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692–93 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)). And, of course, a similarly situated employee cannot share a plaintiff's "race, sex, religion, or other protected status." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 656 (7th Cir. 2021).

Plaintiff identifies two white male postal inspectors—Dean Kowalefski and Jerry Phillips—as potential comparators. [49] at 9. Plaintiff argues that Kowalefski was similarly situated but was treated more favorably because he retired on disability instead of being terminated following a USPIS OIG investigation. The undisputed

facts show that Kowalefski was placed on unpaid administrative leave until criminal charges against him were resolved, and during that time Kowalefski applied for and was granted federal disability retirement through the Office of Personnel Management. [43] ¶¶ 55–56. This occurred before Defendant could discipline Kowalefski. *Id.* Unlike Kowalefski, Plaintiff never faced criminal charges, never applied for federal disability retirement, did not have a disability that would have qualified him for disability retirement status, and rejected Defendant's offer to resign in lieu of termination. *Id.* ¶¶ 45, 59. It is speculation for Plaintiff to argue that Defendant slow walked Kowalefski's investigation. The evidence shows that Kowalefski applied for and received disability retirement from the Office of Personnel Management; Defendant was not involved in that decision. *Id.* ¶ 57. Kowalefski's disability retirement means he cannot be considered a proper comparator. *Johnson v. Soo Line R.R. Co.*, No. 17-CV-7828, 2022 WL 540758, at *11 (N.D. Ill. Feb. 23, 2022), *reconsideration denied*, No. 17-CV-7828, 2023 WL 199338 (N.D. Ill. Jan. 17, 2023).

Plaintiff contends that Phillips should have received a harsher punishment, such as termination, and he should have been investigated by the OIG for his firearm-related conduct. [43] ¶ 61; Def. Ex. 28. As the undisputed facts show, Phillips brandished his weapon in the presence of other inspectors, while Plaintiff misused agency resources and provided false or misleading information on various occasions. [43] ¶ 61; Def. Ex. 28. In short, Phillips's and Plaintiff's misconduct was different. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (noting

18

that an employee served as a poor comparator to the plaintiff because the comparator's alleged conduct (inappropriate physical conduct) was "quite different" from the plaintiff's performance issues (tardiness, subpar work product)). Further, Phillips had a completely different supervisory team than Plaintiff. [43] ¶ 62; *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) ("where the plaintiff alleges the employer disciplined him more harshly than his comparator, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor"). And while brandishing a firearm is serious conduct, it does not go to veracity and credibility, vital characteristics for a law enforcement officer who will be called upon to testify in criminal trials. Based on this record, neither Kowalefski or Phillips can be considered proper comparators.

Plaintiff's discrimination theory also fails under *McDonnell Douglas* because Defendant has introduced a non-discriminatory reason for terminating Plaintiff—he misused his government vehicle, falsified his time records, and lied about doing these things—and Plaintiff has not demonstrated that Defendant's proffered reason served as mere pretext for racially-motivated animus. Pretext means "a lie, specifically a phony reason for some action." *Chatman*, 5 F.4th at 746 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). The Seventh Circuit sets a "high evidentiary bar" for pretext. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). Thus, Plaintiff must show that Defendant's explanations serve as a pretext specifically "for the prohibited animus." *Chatman*, 5 F.4th at 747 (emphasis added) (quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)).

Plaintiff argues that his termination was discriminatory because: (1) he was acting on orders from OIG Agent Enos for every action he took to satisfy his outstanding civil debt, and (2) he actually worked more hours than he recorded on the three days in question. [49] at 7–9. First, Agent Enos had no authority to direct or control how postal inspectors carried out their specific law enforcement activities or duty assignments, and Plaintiff's "acting on orders" defense was considered, analyzed, and rejected by Demtschenko. [54] ¶ 29; Def. Exs. 13, 33. Second, Plaintiff admitted the court appearances, database searching, and meetings with the property owner were personal business that was not reflected in his time and attendance submissions. [43] ¶¶ 33–34, 38, 41. Regardless, even if Plaintiff's arguments were supported by the evidence, neither explains the third charge of providing false or misleading statements in the official matters. Thus, Plaintiff falls short of proving that Defendant's discriminatory animus motivated its decision to terminate Plaintiff.

### 2. *Ortiz* Framework

Under *Ortiz*, "all evidence belongs in a single pile and must be evaluated as a whole," and this Court asks whether a reasonable juror could conclude that Plaintiff would have kept his job if he was a different race, and "everything else had remained the same." 834 F.3d at 766. The Court already determined that Plaintiff did not identify any similarly situated employees or put forth evidence that Defendant's justifications for his termination were pretextual.

Plaintiff put forth a list of actions that occurred throughout his employment with Defendant as evidence that his eventual termination was discriminatory. [43] ¶

68; [10] ¶ 13. But the Court agrees with Defendant that Plaintiff failed to put forth evidence that connects these actions to his termination *or* an unlawfully discriminatory motive.

Many of these actions are speculative and conclusory. This includes Plaintiff's conversation with Vargas in the cafeteria about his arrest history: Plaintiff admits it is speculation that Vargas had similar conversations with non-Black inspectors in his office. [43] ¶¶ 16, 18; Def. Ex. 2 at 244:21–24. Plaintiff presents *no* evidence about Vargas's actions with other inspectors. Plaintiff's also asserts that he was "falsely accus[ed]" in 2013 in connection with a missing piece of electronic equipment, and in 2014 he was issued a reprimand for laying his weapon on the table in the presence of visitors. [43] ¶¶ 69, 71. But Plaintiff failed to develop any evidence connecting these two incidents to racial animus. Regardless, Plaintiff acknowledged that he should have maintained control of the device and failed to present evidence that the letter of warning was issued to him because of his race. *Id.* ¶ 69.

Additionally, there is no evidence that Plaintiff was not allowed to attend an IAFCI event or required to work the command center during an arrest due to his race. [43] ¶¶ 68–69. While Plaintiff argues these decisions by Vargas were based on race— as he was the only Black inspector on the mail theft team—this alone is insufficient evidence to support a reasonable inference of discrimination.

As for the second background check, it is undisputed that a criminal background check is conducted on all inspectors before they gain access to the CLEAR database. [43] ¶ 16; Def. Ex. 11. Similarly, Plaintiff cites the OIG investigation that

21

was opened due to an arrest as evidence of discrimination, but it was agency policy to refer issues related to inspector arrests to the OIG. [43] ¶ 20.

Finally, Plaintiff highlights Vargas's use of the term "airhead" and asserts it is a racial slur used to refer to Black males. *Id.* ¶ 73. Generally, "stray remarks" will "not support an inference of discrimination unless the decisionmaker or someone with influence over the" adverse employment decision "made the comment around the time of, or about, the adverse action." *Seymour-Reed v. Forest Preserve Dist. of DuPage Cty.*, 752 F. App'x 331, 335 (7th Cir. 2018) (internal quotation omitted). Here, Plaintiff failed to develop any argument that these remarks in 2014 were connected to his termination in 2016. [49]; *Alvares v. Bd. of Educ. of City of Chi.*, No. 18 CV 5201, 2021 WL 1853220, at *11 (N.D. Ill. May 10, 2021) (granting summary judgment to the defendant where the plaintiff presented some evidence of racial bias, but no evidence that the bias had any connection to his termination).

In sum, the evidence suggests that Defendant terminated Plaintiff because he misused his government vehicle, falsified his time records, and lied about doing these things. No reasonable jury could determine otherwise. Thus, Plaintiff fails to raise a genuine issue of material fact under the *Ortiz* framework because he lacks evidence that his race caused his discharge.

## IV. Conclusion

For the stated reasons, Defendant's motion for summary judgment [41] is granted. The Clerk is directed to enter judgment in Defendant's favor and against Plaintiff and terminate the case.

E N T E R:

Dated: September 1, 2023

_____
MARY M. ROWLAND
United States District Judge